Oh yes, oh yes, oh yes. The Honorable Doug Thornton, 5th District, State of Illinois, sound session. Please be seated. Good morning, everybody. Let's start with Holcomb v. Illinois Civil Service Comm'n and Illinois Department of Transportation. Please proceed. Good morning. My name is Frank Roosevelt. I represent Tim Holcomb, this morning, the appellant. Mr. Holcomb worked for IDOT, Illinois Department of Transportation, as a highway maintainer and worked for them for four years when on January 30, 2014, he was required to take a random drug test, which he did. The result that the court has before it is that a finding was of a drug metabolite cocaine. Mr. Holcomb had worked there without incident. There was a fairly good work record. He had previously worked and served in the military for eight years and had served as a police officer for a number of years. Mr. Holcomb had, days before the random drug test on January 21, 2014, entered into a drug counseling program. John Frum, as the counselor, testified regarding Mr. Holcomb's involvement. Mr. Holcomb did that voluntarily on his own initiative. He was immediately taken off duty upon the return of the drug result. He had worked several days thereafter without incident, though, before the results were known, and was removed from service. Mr. Holcomb's involvement then with the counselor was good, with an excellent prospect of returning to work. Mr. Frum also opined in his testimony that he doesn't present a danger in returning as a driver for IDOT or highway maintainer. The controversy extended regarding how the procedure was followed. IDOT immediately filed charges alleging that he had the positive drug test and that he was under the influence of cocaine. So, Mr. Roosevelt, this is a quarrel between cocaine in one form versus a metabolite of cocaine. Is that how you boil it down? Your Honor, they aren't distinct, as both Frum and Dr. Knapp have opined. The metabolite is simply a marker of past use. It's a separate chemical, as well described in the testimony of the two experts. But in the job that your client is involved in, he drives a truck for IDOT? He does. And so when is the state agency supposed to know when it's a metabolite or when he's under the influence? How is it their job to know that? Simply because they are the employer and they have the permanent proof here that shows the cost for discharge. And their own expert, Ms. Knollenberg, who runs the program, testified when I asked her what is a metabolite that she didn't know. She didn't know the distinction between the two. The drug results are shown to IDOT. They have a medical review officer, Dr. Knapp. He is board certified in three areas, has a master's degree from Johns Hopkins. He is their witness, their So let me, I'm sorry to keep interrupting, but I do have some questions. As I'm sure you know, I always do. That's all well. Thank you. So your client had admitted to use of cocaine on January 26th. He stayed home from work the next day and then went to work on the 28th, right? Right. He called in sick on the 27th? I don't believe it was a call in. I believe it was. I apologize if I misspeak, but I believe that was a day off. It was a Sunday. Okay. I didn't look at that. So had it not been a holiday, I guess my concern is he uses cocaine on the 26th. Is it a metabolite on the 27th or is it a metabolite on the 28th? I mean, he's driving a truck that I think everybody would admit that if you're under the influence of cocaine, you pose a danger to yourself and members of people on the highway. Right? Absolutely. So why is the burden on IDOT to determine whether he is or is not under the influence since we know he uses cocaine? And he has used cocaine. And has used. And in fact has been in treatment, as you well point out. I'm just, I'm really trying to focus on the burden here. Right. Whose burden is it? It's clearly IDOT's. Once they get that test result, the fact is that cocaine, according to both experts, is in that system for an hour and a half. It is quickly metabolized. And then it's turned into a different stimulant, which is simply margarine. So that explains why he used four days, Sunday before this test on Thursday. By that point, obviously, we're four days thereafter. Well past the hour and a half, whether you're going to be under the influence of the cocaine itself. And that would explain why he worked without incident as he returned back. That's why Mr. Visor, who testified, a co-worker, that he wasn't under the influence. He was working with him and saw him and was close and knew him and had worked previously and never seen an instance where he was under the influence of anything at work. Even though this gentleman had used cocaine. But again, the metabolism is very fast acting, which explains. It's up to the Illinois Department of Transportation to show that there is a clear, compelling reason, according to the administrative code, that there must be a discharge here versus following their own experts' testimony, Dr. Knapp, that the first thing you do is send him to a drug evaluation. Those are federal regulations, according to Dr. Knapp. Dr. Knapp states those were not followed. You do a drug evaluation and you learn what the prognosis is for this employee. Do we have an opportunity here to send him on to treatment so that we may, after the treatment, after he succeeds in treatment, after he has complied in treatment, then in periodic testing and treatment, once he's successfully completed it, this is Dr. Knapp. He's going to be sent to the service, but not blindly accepting that he's going to be able to comply. Even there, he is going to be through a protocol of periodic drug testing as he returns. And only after the program of treatment that IDOT approves, federal regulations require the referral, according to Dr. Knapp, to that drug process and that drug evaluation so that you can make an informed judgment as the employer. I apologize. No, I apologize. So you're saying that the state of Illinois must refer him to a federal program? According to Dr. Knapp, their expert, he says it's mandatory in his testimony. Under what? Like under the CDL provisions? What? Under what? Exactly. Under U.S. Department of Transportation protocol and procedures. And when we think about it, it makes sense because it enables us as the employer where we have somebody who has a history of, and we know a marker, there's been some kind of cocaine use. We know here that there's no issue of his driving under the influence. He was not driving under the influence of cocaine, period. And we know further that it makes sense to learn what that process is. The right here is to progressive discipline unless there's a clear reason under the Illinois Code rules to do something other than progressive discipline. And in fact, we need to consider his, according to the rules of the commission, we must consider his prior work history, his prior disciplinary history, his length of service, all of which were very favorable for this gentleman. There was no accident. This is not a gentleman who had four accidents, wrecked four snowplows, and then we figure out cocaine played a role. He's never been observed to be under the influence of work, and he had never had an accident in his four years of service to IHOP. So where we have a system where we have progressive discipline, where it's a burden of the state to prove that its own rules do not follow. In this instance, it failed to follow federal rules by going the route of the testing and the evaluation so that we can make an informed judgment about an employee. This is a time of someone where we ought to be informed. The person running the program doesn't know what a metabolite is when she's asked. Let me ask a question. Do you agree with IDOT that the operating of a snowplow is a safety sensitive position? Absolutely. And it is. And it common sense would dictate that it is. And that's why we couldn't blindly return someone to service in this circumstance, even though there's no showing of an accident, even though there's no showing that he was under the influence. And that's been proven. It's off the record. What was his relationship to Dr. Crum? Dr. Crum, he chose Dr. Crum. Days before, on January 21, he entered Dr. Crum's program permanently, on his own, voluntarily, seeing the need to do it. Without the instance of the employer, without this test, he initiated that. Holcomb did it on his own. So why isn't Dr. Crum's participation, and why can't we look retroactively and say, well, we didn't do what this federal guideline said, but essentially this gentleman had the benefit of those regulations, because he was in the program. He was an admitted cocaine user, addicted. Dr. Crum, I think, said he had one relapse. So why didn't that voluntary admission act as a substitute, if you will, for the federal regulations? Absolutely not. Because the regulation is sending it for an evaluation, determining what kind of program is important and what the prognosis is, and where do we go from here. We have rules saying we're going to follow progressive discipline, unless there's a clear reason not to, in the absence of us being under the influence or an accident. Then you need a professional evaluation guiding you and telling you and supporting your decision making here on how you wish to proceed and how best to proceed, both in the public's interest. And absolutely, it's argued that, well, we want a pass for this gentleman. Going through this program is not a pass. Going through this program is assuring public safety. It's treatment with the periodic testing, both during the program and after he returns to service, only after he's certified by the treatment facility approved by IDOC would he ever return. If he can't succeed and matriculate, he doesn't come back. So this is not a pass. This is about setting up a system compliant with federal regulations, compliant with the Commission's and the state's own rules on progressive discipline. We can argue that that's not right. The state has misguided it. Another question. Based on the timeline, didn't he self-report to Dr. Crum? Yes. And what was the date of that? January 21. And so his use was after he was under the treatment of Dr. Crum, is that right? That is absolutely correct. That is absolutely correct, and that's the nature of the beast. And there was another instance, according to Crum, at least one, where he did relapse during treatment. And that is the goal of treatment. Other than the 26th? You mean another relapse other than the 26th? Yes, yes. So the 26th is not being called a relapse? Not the last one, no. And that's the purpose of treatment. That's going to be the nature of that illness, is that you're going to be subject to it. Now, keep in mind, Crum's experience being doing this for years, and I think Dr. Knapp would say the same thing. Treatment is to solve a problem, and that's why we have periodic testing during the treatment, and that's why you have periodic testing once the treatment administrator says, you're ready. And Crum says the prognosis is excellent. He can return after treatment and operate safely. In fact, his history during four years of service to the state of Illinois had been excellent. He had no accidents, never seen under the influence. Had he had drug testing? Yes, he had. In those four years? Yes, he had. And I will tell you, you'll see in the record, in 2011, he went to EAP, employee assistance, and was treated, was an intervention in 2011 previously. You know, this is just simply, you know, not a situation where we just carte blanche say, okay, we've got metabolite binding, marker prior use, then we're going to fire somebody. Absolutely. We have a system, we have the regulations, both with the I.M. Department of Transportation. The goal here is the treatment and follow-up that's appropriate so that everyone involved is safely taken care of, and I think that's why both Crum and NAP were looking at that direction. I respectfully thank you for your time this morning and your consideration. Thank you, counsel, and you'll have the opportunity for a rebuttal. Thank you. Argument for the appellee. Good morning, Your Honors. Good morning. I'd like to begin by clarifying what's in the statement of the record, and this came out a lot in counsel's argument this morning, was the suggestion was made that Dr. Knopp the medical review officer had testified that made a recommendation that the plaintiff be sent to rehab, and in fact said, and that was a requirement of the federal regulations. That's not correct, and that was not the testimony. What's not correct? I'd like to clarify that. Dr. Knopp was asked a couple of questions about what the federal regulations require, and the federal regulations come into play because the test was administered according to federal regulations, and there are federal requirements that the state agency has to follow about safety-sensitive employees, and what the doctor said correctly was that under the federal regulations, a safety-sensitive employee who tests positive is supposed to go through a drug evaluation, rehabilitation, and a follow-up testing. But to be clear, those federal regulations that the doctor was talking about, they say on their face that the decision whether to discharge a safety-sensitive employee who tests positive is a personnel decision that's within the employer's discretion. So under the federal regulations, an employer is perfectly free to decide that consistent with their policy, they will discharge an employee who tests positive, and the particular site for that is 49 CFR 40.305. In general, 49 CFR Part 40 has a lot of these federal regulations, and this one in particular, 40.305, talks about how whether to discharge is a personnel decision, but what the regulations require is if for some reason that employer decides that they do not want to discharge that employee who tests positive, then under the federal regulations, the employer could not simply put the employee back to work. That employee would then have to go through successfully this specified process that's in the regulations of evaluation, testing, and certification. And the doctor was asked simply, well, what are the federal regulations requiring? He correctly answered, well, the employee couldn't go back to work, they would have to go through this testing. But the doctor was not asked for a recommendation about discipline in this particular case. He was not asked anything about IDOT's personnel policies or collective bargaining agreement. He simply described the federal regulations. At the end of the day, even if the doctor had given an opinion on discipline, the doctor's job is to evaluate the drug tests and, you know, talk about whether the drug test was positive or not. He's not giving an opinion on discipline, so that wouldn't be something that binds the commission. But I think that's more than we need to go here, because when you review that record, Dr. Knopf did not give any recommendations about discipline. He did not say that the federal regulations require that an employee be returned to duty after going through this process. May I excuse you one second? In 2011, is the record going to show that Mr. Holcomb had gone through a program and that IDOT had complied with these regulations and given him another opportunity and things of that nature? Is that well developed in the record? There's a little bit about 2011 in the record. In 2011, he acknowledged that he was having some problems with cocaine in 2011. There seems to be a positive drug test, which he says for some formal reason that test was not good. He does seem to be in an employee assistance program, and we know he was not discharged at that time. We don't know a lot more about the circumstances of 2011. But just get back to the federal regulations for a moment. Nothing in this record is not in compliance with federal regulations, and that's the point I want to stress. Under federal regulations, whether to discharge an employee who tests positive for drugs, particularly the safety-sensitive employee, is a decision that is committed to the discretion of the employer. He might have actually been given a second chance in the past in 2011. And this time, looking at the evidence of record, the decision was made that this employee should be discharged, and that was a reasonable decision based on all of the evidence of record. Ultimately, what this court is looking at, the court has a very limited review role. And what the court is looking at is, is the decision to discharge arbitrary, unreasonable, or unrelated to the requirements of service? There's case law that's cited in the brief where the Illinois Supreme Court is very clear that it's not the court's role to decide what punishment or what discipline, rather, the mitigating circumstances. The court's only role in review is to consider whether the decision is arbitrary, unreasonable, or unrelated to the requirements of service. And this is a situation where the evidence showed that IDOT had a very strict policy of discharging employees, particularly safety-sensitive employees who test positive for drugs. That's in the collective bargaining agreement as well. The plaintiff here was a safety-sensitive employee who had a commercial driver's license and was responsible for duties including driving heavy machinery. What was in the collective bargaining agreement? I'm sorry. In the collective bargaining agreement as well, it's bargaining agreed to that a positive drug test will result in a suspension pending discharge. So it's also part of the collective bargaining agreement as well as the policy. The collective bargaining agreement also acknowledges that IDOT as an employer has to follow these federal requirements which set forth the drug testing program and what to test for it, how to test for it, and so on, which was followed here. The other evidence included, the plaintiff acknowledged that he had had a positive drug test and in fact he acknowledged that he had had a cocaine problem. The ALJ found that the plaintiff was not credible actually about the extent of his cocaine usage or his cocaine problem. He did enter a treatment program and his treatment counselor testified. His treatment counselor testified that the plaintiff had been using cocaine extensively in the intervening years between 2011 and 2014 and had been using cocaine while he was in the treatment program. The plaintiff did not acknowledge the extent of cocaine usage. He testified contrary and said that he had not been using cocaine between 2011 and 2014 except for a couple of days before the test. So he's contradicted by his own addiction counselor. And I mention that because a lot of what we're getting into is weighing facts. Counsel's asking us to re-weigh the facts, asking the court to re-weigh the facts here, which is not your court's role. And when he points to factors such as the plaintiff was trying to address his problem and the plaintiff voluntarily entered this treatment program or the plaintiff had a satisfactory disciplinary record, all those are factors. But there are other factors in the record. The factors that I have mentioned about the plaintiff not testifying credibly about his own history, his being a safety-sensitive employee, IDOT strict policy, the collective bargaining agreements requirements, and of course the positive drug test. So in light of what is in the record, it cannot be concluded that the decision to discharge this employee was unreasonable. It was a very reasonable decision not to take chances with employee safety, public safety, a reasonable decision to preserve the public trust, to say that we want to have productive employees that are functioning on all cylinders. And I think that ultimately decides it here and is why the commission's decision has to be upheld. At one point, a question was asked about was it the burden on IDOT to show that he was under the influence of cocaine, and I'd like to clarify, too, that there were multiple charges before the commission. They kind of boiled down into two areas, and the ALJ says this in his recommended decision. One of the charges had to do with actively being under the influence of cocaine, showing up to work under the influence of cocaine. And the other charges related to producing a positive drug test, which is also a violation of the policy in the collective bargaining agreement. And the ALJ found, and this is where the testimony of Dr. Knopf and the addiction counselor Crump come in. They both said cocaine is so short-lived that it can be in and out of a person's system in an hour and a half. So based on the testimony, the ALJ found, well, the charge is not sustained that he arrived at work actively under the influence of cocaine. So that was not the basis for his discharge. The other set of charges which had to do with producing a positive drug test were found to be proven, and those were the reasons for his discharge. And so that is just to clarify how under the influence is really somewhat beside the point here, because he was not found to be actively under the influence at the time of the drug test. And then there's some discussion, some questions about, well, does it matter here that this was a cocaine metabolite? And the plaintiff had argued in his briefs that, well, that's not really a positive drug test, and I don't think that's a position that can have any merit for several reasons. It ignores federal law that this was a test that was administered in accordance with federal regulations. And there's no question under the federal regulations that this was a positive drug test. Those regulations are very clear what to test for, including cocaine metabolite, what the cutoff levels are, what a positive result is, and this is a positive result under those federal regulations. Then we look to IDOT's policy. We look to the collective bargaining agreement. They specify what should the consequence be, and the consequence is a discharge. I think the plaintiff is also ignoring the standard medical practice based on the testimony of record, which was that the way you test for recent cocaine use is you look for this metabolite. That's how you do it. You couldn't look for the presence of cocaine because the cocaine is so short-lived. So the test that was performed was a very standard test consistent with medical practice, and ultimately the idea that he didn't have a positive drug test here, even though the test showed recent cocaine use, I think that produces a very strained reading of the policy, and it would defeat its purpose. It's kind of running counter to understanding to say, well, you had a drug test, and the drug test was a positive test, and if you, under that view, most drug tests for cocaine use would end up being negative, even if the person had taken a lot of cocaine. So the purpose of the policy would be completely thwarted, and there's a few cases that he cites in his brief, but none of those say that a policy has to include the word metabolite or there's some problem with the policy. So there's really nothing that supports that reading. So when we look at the evidence that is in the record, it shows that the commission's decision was very reasonable, cannot be considered unreasonable, arbitrary, or contrary to the requirements of service. And there's no deficiency or problem with the policy that is persuasively argued, and for all those reasons, the commission's decision should be affirmed. There was a point made about testimony where the program administrator, in the course of her testimony, said, I don't know what a metabolite is, and she did say that, but when you look at the testimony as a whole, the program administrator also said, she explained IDOT's policy. She explained that IDOT had to have this random testing program in accordance with federal regulations. She explained what IDOT's policy was, was to discharge employees from a positive drug test. She said that she believed, in her opinion, the plaintiff had been properly discharged under the policy, and in saying that she did not know what a metabolite was, was in the context of her saying, well, I rely on the doctor to tell me what a positive drug test is. I'm not a doctor. So there's nothing about that testimony that in any way would undermine the commission's decision or show that it was somehow unreasonable or arbitrary. If there are... You do agree, though, that under the narrow finding that there was a positive drug test, and so we're firing him. That's the only decision the ALJ made as a recommendation for firing, is the positive test, right? But there is some wiggle room, if you will, about reviewing the individual's past history, his work record, things of that nature. I believe those are factors that could be taken into account and were actually taken into account here, but ultimately the ALJ, as adopted by the commission, made the finding that despite some factors for the plaintiff that could be viewed as positive, discharge was warranted based on the circumstances of bribery. Yes, and those circumstances included the strict discharge for positive drug test policy, the collective bargaining agreement which had been agreed to, plaintiff's status as a safety-sensitive employee, plaintiff's acknowledgment of a positive drug test, plaintiff's acknowledgment of a cocaine problem. So you have all of that on the other side. Does IDOT have a strict zero-tolerance policy for this kind of thing? IDOT does, yes. Okay. So despite what I call wiggle room, basically it's a zero-tolerance policy. If you test positive for a drug, you're out. That's what the policy is. But remember, this went before the commission. I understand. The commission can apply a larger limit, but they're certainly going to give a lot of weight to an agency's policy where the agency has said, we think this is very important for reasons of public safety and so on. And I do understand that. I don't mean to diminish that. I'm just wondering if they're basically, from IDOT's perspective, is a zero-tolerance policy. Yes. I think it would have to be an extremely extraordinary circumstance that would warrant not applying the policy. And one reason for that is I think the policy works best to promote safety and to discourage drug use if it is consistently applied. And also because opportunities for drug testing are necessarily limited. I mean, even the random testing is just for safety-sensitive employees, and you can't randomly drug test someone every day. So there's limited opportunities for testing as well. So you're not treating Mr. Holcomb any differently. IDOT, I mean, is not treating him any differently than they would treat any other employee under the similar circumstances. That's correct. And for all those reasons, we believe that the commission's decision should be affirmed. If there are any questions, I will answer them. Otherwise, I'll conclude. Thank you. Thank you, counsel. Mr. Roosevelt, rebuttal? Yes, thank you. I think I certainly wouldn't want to suggest, nor did I, that there's a federal regulation that requires this return to work. Absolutely not. That would be as foolish as the position would be in light of the rules of the commission that if you have a positive test, you must be discharged. Those aren't the rules. That's not the procedure. That's not the system. But the testimony is key. Finding number 21 of the administrative law judge in the commission. Crum testified that the progress of Holcomb's treatment was very good, and his prognosis was excellent. This is a finding of the commission. Finding number 23. Crum testified that he believes Holcomb can return to work and succeed in his job. What does that mean? Succeeding at your job, though, doesn't mean you're not going to try cocaine once in a while. It means you're going to. Because he succeeded at his job, and yet had incidents of cocaine while working. Absolutely. And succeeding means complying with those rules. And it includes under the program that Dr. Knapp described, periodic testing once he returns to work. You test positive, you're gone. Succeeding means maintaining sobriety. And that's the point of the treatment. That's the point of doing this. I think one of the concerns, at least I have as sitting here, is that cocaine is unlike alcohol, where, as you say, cocaine goes through the system very quickly and it's gone. So the only way to test for it is these markers. And so with alcohol, you know, somebody comes in kind of stumbling. They might smell of alcohol, and so you might be able to catch it. That's exactly the problem. It's a problem. The Arizona Supreme Court has ruled that they cannot use a marker of, for instance, a metabolite of marijuana upon an arrest to make a charge of DUI because the metabolite has nothing to do with your mental status four days later. It does not include any indication that you're under the influence at all. But that's not as applicable. That's a criminal situation. Here you're trying to prevent somebody from going on the road who poses a risk, and you have no idea that that person may have used cocaine that morning before he decided to get it behind the wheel of a snow plow, for example. In that instance, the co-workers, for instance, Duane Fikes, their test buddy, never saw him under the influence, and there were no accidents over a four-day period. So the facts are that he was not using cocaine that morning, nor was he using cocaine at work. And the finding of the commission was that he wasn't under the influence of cocaine. That's the finding of the commission. Dr. Neff, in his testimony, much discussed, asked, did you know whether the applicable federal regulations require the immediate removal of somebody in a sensitive position? Yes, sir. Once the test comes back positive, you're removed. That's for the public's protection. Makes sense. Asked by the assistant attorney general, so when would they be returned to their duties? Could you explain that? Either there's a kind of, on the alleger, if it's a confirmed positive test, then they have to go through an evaluation with a listed substance abuse professional to determine what type of abuse disorder that they may or may not have, and then they recommend what type of return to duty process that they should go through, whether it's rehab, whether they can be returned to duty, and then also what type of follow-up testing is indicated over the next 6 to 12 months. That's the testimony. It's at the record, C-306, C-307. He's asked by the assistant attorney general, do you know whether in this case the department recommended any substance abuse professionals or gave the names of substance abuse professionals? I don't know. Under the federal guidelines, they have to. So the pertinent proof here is on the statement. Rule 1.170 of the commission says we must consider the performance record for nature of defense, disciplinary history, length of service. 302.626 says unless grounds clearly present which warrant discharge, then we use progressive discipline, all consistent with Dr. Knapp, Dr. Crum, and a protocol that will assure the public's safety and the service of the state of Illinois by an enlightened policy of using treatment before testing. Thank you. I thank you, counsel. And counsel, thank you for your briefs and your arguments. We'll take this case under advisement and issue a written ruling in due course.